**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| MOUNTAIN AIR CARGO, INC.,     ) | |
|                    ) | |
|     Plaintiff,           ) | |
|                    ) | C.A. No. |
| v.                       ) | |
|                    ) | |
| GAMA CAPITAL, LTD.,      ) | |
| CHARLES A. HEFFERNAN, JR., and  ) | |
| PAMELA R. HEFFERNAN,     ) | |
|                    ) | |
|     Defendants.      ) | |

## COMPLAINT

Plaintiff Mountain Air Cargo, Inc. ("Plaintiff" or "MAC"), by and through its undersigned counsel, hereby alleges as follows:

## NATURE OF THE ACTION

1. This is an action for breach of contract, fraudulent concealment, and contractual indemnification arising out of MAC's purchase of the membership interests of Royal Aircraft Services, LLC ("RAS") from Defendants GAMA Capital, Ltd. ("GAMA"), Charles A. Heffernan, Jr. ("Charles"), and Pamela R. Heffernan ("Pamela") (GAMA, Charles, and Pamela are hereinafter collectively, "Defendants" or "Sellers").

2. On May 15, 2025, MAC and Sellers entered into a Membership Interest Purchase Agreement (the "Purchase Agreement") under which MAC acquired all membership interests in RAS. A true and correct copy of the Purchase Agreement is attached hereto as **Exhibit A** and incorporated herein by reference.

3. In the Purchase Agreement, Sellers made disclosures, representations, and warranties concerning, among other things, the condition and sufficiency of assets at RAS's Hagerstown, Maryland facility, compliance with laws and permits, and environmental matters.

4.      Before closing, Sellers knew that the fire suppression system at the property contained aqueous film-forming foam ("AFFF") that contained per- and polyfluoroalkyl substances ("PFAS"). Sellers also knew that Maryland had restricted or banned the use and discharge of AFFF/PFAS foam, that fire-protection vendors were refusing to service or test the system because of environmental and health risks, and that the system would need to be converted to a safer, non-hazardous system.  Sellers did not disclose those material facts to MAC before Sellers and MAC closed on the Purchase Agreement.  In fact, Sellers expressly represented and warranted that no such facts existed.

5.      Sellers also failed to disclose that the paint-shop ventilation system at the Property, including the heat-exchange unit and air conditioning, was inoperable or in need of substantial maintenance, creating operational, health, safety, and regulatory risks for RAS's aircraft painting business.  In fact, the Sellers expressly warranted that the opposite was true.

6.      After closing, MAC discovered these conditions, provided Sellers formal notice of Direct Claims (i.e. breach of the Purchase Agreement) and a demand for indemnification under the Purchase Agreement. Sellers have failed and refused to indemnify, reimburse, or otherwise make MAC whole.

## PARTIES

7.      MAC is a corporation organized and existing under the laws of North Carolina, with its principal place of business at 5930 Balsom Ridge Road, Denver, North Carolina 28037. MAC was defined as the "Buyer" under the Purchase Agreement.

8.       GAMA is a Texas limited partnership located at 3012 Sparkling Brook Lane, Austin, Texas 78746.   The sole general partner of GAMA is GAMA Management, LLC, whose members are Gary Cotshott and Marlene Cotshott, both individual residents of the State of Texas.

GAMA is defined as a "Seller" under the Purchase Agreement and, before closing, owned 50% of the membership interests in RAS.

9.      Charles is an individual residing in Maryland. Charles is defined as a "Seller" under the Purchase Agreement and, before closing, owned 24.8% of the membership interests in RAS.

10.      Pamela is an individual residing in Maryland. Pamela is defined as a "Seller" under the Purchase Agreement and, before closing, owned 25.2% of the membership interests in RAS.

## JURISDICTION AND VENUE

11.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between MAC and the Sellers, and the amount in controversy exceeds $75,000. Complete diversity of citizenship exists because:  (a) MAC is a North Carolina corporation with its principal place of business located in North Carolina, (b) GAMA and its sole general partner and the members of its sole general partner are either organized in or residents of the State of Texas, and (c) Pamela and Charles are citizens and residents of the State of Maryland.

12.      Personal jurisdiction over Sellers is proper. As reflected in the Purchase Agreement, Sellers agreed to submit to the jurisdiction of this Court when they agreed that "any legal suit arising out of or based upon [the Purchase Agreement], the ancillary documents or the transactions contemplated hereby or thereby may be instituted in the federal courts of the United States of America . . . located in in the County of New Castle, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding."

13.      Pursuant to 28 U.S.C. § 1391, venue is proper in this Court because MAC's claims arise out of and relate to the Purchase Agreement and Sellers consented solely to venue in the United States District Court for the District of Delaware, which is located in New Castle County.

14.    All conditions precedent to MAC's claims have occurred, have been performed, have been waived, or are excused.

**FACTUAL BACKGROUND**

15.    RAS is a Maryland limited liability company with a principal place of business at 18335 Aircraft Road, Hagerstown, Maryland 21740, also referred to in certain records as 18335 Airpark Road (the "Property").

16.    RAS provides aircraft painting, maintenance, repair, and overhaul services, together with parts sourcing and sales.

I.    **THE PURCHASE AGREEMENT.**

17.    Before May 15, 2025, Sellers collectively owned all membership interests in RAS. Sellers controlled or had access to RAS's books, records, vendor communications, facilities, operations, environmental records, fire-suppression records, and maintenance records.

18.    On May 15, 2025, MAC and Sellers entered into the Purchase Agreement.

19.    Under the Purchase Agreement, MAC acquired all the membership interests in RAS from Sellers, and Sellers received the consideration provided in the Purchase Agreement.

20.    Unless otherwise defined herein, capitalized terms in this Complaint have the same definition as in the Purchase Agreement.

21.    Article III of the Purchase Agreement contains the express disclosures, representations, and warranties which Sellers' made to MAC as part of this transaction.

22.    Those disclosures, representations, and warranties include, but are not limited to, the following:

   a.  Section 3.08(a): There has not been an "event, occurrence or development that has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Company or its assets[.]"

4

b.   Section 3.10(d): "The use and operation of the [the Property] in the conduct of the Company's business comply in all material respects with all applicable Laws, covenants, conditions, restrictions, easements, licenses, permits, and agreements."

c.   Section 3.11: "The buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property currently owned or leased by the Company are in operable condition (excepting for ordinary wear and tear, obsolescence, out-of-service equipment or inoperable equipment held for spare parts or for later disposal."

d.   Section 3.17(a): "No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any [Action against or by the Company or affecting any of its properties or assets (or by or against a Seller or any Affiliate thereof and relating to the Company)]."

e.   Section 3.18 "[T]he Company for the past three (3) years has complied, and is now complying, with all Laws applicable to is or its business, properties or assets, the noncompliance with or violation of which would reasonably cause a Material Adverse Effect."

f.   Section 3.19(a): "To Sellers' Knowledge the Company is currently and has been in compliance with all Environmental Laws, and the Company has not received from any Person any: (i) Environmental Notice or Environmental Claim; or (ii) written request for information pursuant to Environmental law, which, in each case, either remains pending or unresolved, or is the source of ongoing obligations or requirements as of the Closing Date."

g.  Section 3.19(b): "[T]o Sellers' Knowledge neither Sellers nor the Company is aware of any condition, event or circumstance that might prevent or impede, after the Closing Date, the ownership, lease, operation or use of the business or assets of the Company as currently carried out."

h.  Section 3.19(e): "Sellers, to Sellers' Knowledge, have provided or otherwise made available to Buyer and listed in Section 3.19(e) of the Disclosure Schedules: (i) any and all environmental reports, studies, audits, records, sampling data, site assessments, risk assessments, economic models and other similar documents with respect to the business or assets of the Company or any currently or formerly owned, operated or leased real property which are in possession or control of a Seller or Company related to compliance with Environmental Laws, Environmental Claims or an Environmental Notice or the Release of Hazardous Materials; and (ii) any and all material documents concerning planned or anticipated capital expenditures required to reduce, offset, limit or otherwise control pollution and/or emissions, manage waste or otherwise ensure compliance with current Environmental Laws (including, without limitation, the costs of remediation, pollution control equipment and operational changes)."

23.  Sellers made those contractual disclosures, representations, and warranties jointly and severally and represented and warranted that the statements in Article III were true and correct as of the date of closing.

24.  Article I of the Purchase Agreement defines "Hazardous Materials" as follows:

(a) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or

manmade, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws; and (b) any petroleum or petroleum derived products, radon, radioactive material or wastes, asbestos in any form, lead or lead containing materials, urea formaldehyde foam insulation, and polychlorinated biphenyls.

25.     Under Section 7.02 of the Purchase Agreement, Sellers agreed, jointly and severally, to indemnify and hold MAC harmless from, and to pay and reimburse MAC for, Losses[1] arising from or relating to inaccuracies in or breaches of Sellers' contractual disclosures, representations, and warranties, and breaches or non-fulfillment of Sellers' covenants, agreements, and obligations under the Purchase Agreement.

## II.    THE FIRE SUPPRESSION SYSTEM

26.     The fire suppression system at the Property includes foam-water and deluge components, foam tanks, proportioners, and related equipment (the "Fire Suppression System").

27.     The Fire Suppression System contains and uses AFFF, including 3% MSAFFF, a Class-B firefighting foam that contains PFAS.

28.     AFFF/PFAS is toxic, persistent, environmentally hazardous, and is a "Hazardous Material" within the meaning of the Purchase Agreement.

29.     Before the May 15, 2025 closing, Maryland law had restricted and/or banned the use, sale, installation, testing, and discharge of Class-B fire-fighting foam containing intentionally added PFAS, including AFFF.

---

[1]Article I of the Purchase Agreement defines "Losses" as the "net of applicable ordinary-course-of-business insurance proceeds and net of any tax benefits actually attributable thereto, losses, damages, Liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification [under the Purchase Agreement] and the cost of pursuing any insurance providers; provided, however, that 'Losses' shall not include punitive, special, consequential, or indirect damages, except to the extent actually awarded to a Governmental Authority or other third party."

30.     Between 2021 and the end of 2023, the Sellers repeatedly corresponded with third parties regarding the presence of AFFF/PFAS at the Property.

31.     Pamela directly received and participated in multiple pre-closing communications regarding the presence of AFFF/PFAS at the Property.

32.     Upon information and belief, Pamela was acting as an owner, manager, and representative of RAS and Sellers in connection with those communications.

33.     For example, or about March 12, 2023, Pamela contacted Harris Fire Protection ("Harris") about testing and refilling RAS's Fire Suppression System.

34.     On or about April 7, 2023, Harris informed Pamela that state legislation had been passed regarding AFFF foam system installation and testing. Harris further stated that "no new system will be installed," that there was a question whether Harris could "even supply existing systems with product," and that testing of the systems conflicted with the applicable code. Pamela then forwarded the communication internally and wrote, "This f'n sucks."

35.     On or about June 29, 2023, Harris further informed Pamela that, because of new state regulatory requirements restricting use and discharge of foam systems, Harris could take foam samples and trip sprinkler valves with foam closed off, but could not "flow any foam for proportioning discharge testing." Harris explained that Maryland had not provided proper methods to dispose of the foam.

36.     On or about August 3, 2024, another vendor, Summit Fire & Security ("Summit"), informed Pamela that RAS's "foam system uses AFFF" and that Summit therefore could not "touch the foam portion" of the Fire Suppression System. Summit offered to connect Pamela with engineering and consulting personnel to discuss options for replacing the AFFF foam systems.

37. On or about August 26, 2024, Harris informed Pamela that Harris would not service RAS's AFFF Fire Suppression System because of the "current legal situation surrounding AFFF Foam." At that time, Harris explained this was because AFFF was being heavily litigated as a "forever toxic chemical" and possible carcinogen, and because accidental AFFF discharge could create "environmental legal exposure."

38. On or about August 28, 2024, Pamela asked whether a third-party vendor could "replace the AFFF foam with safe foam."

39. These facts were known to Sellers before the closing.

40. Sellers knew or should have known that the presence of AFFF/PFAS foam was material to MAC because of environmental risk, regulatory compliance, employee safety, vendor availability, the condition and sufficiency of a mission-critical fire-protection asset, operational continuity, the value of RAS, and the price and terms MAC was willing to pay.

41. Despite their knowledge, Sellers did not disclose to MAC before closing, and fraudulently concealed from MAC, that the Fire Suppression System contained AFFF/PFAS (a Hazardous Material under the Purchase Agreement), that Maryland had restricted or banned the use, sale, installation, testing, or discharge of that foam, that vendors would not service, test, or touch the foam portion of the Fire Suppression System, that accidental discharge could create environmental legal exposure, or that MAC would need to convert the Fire Suppression System to a legal, non-hazardous foam system. In fact, in breach of Article III of the Purchase Agreement, Sellers represented and warranted that the opposite was true.

9

42. After closing, on or about March 18, 2026, MAC had a third-party vendor, Hub City Sprinklers, Inc. ("Hub City"), perform an annual inspection of the Fire Suppression System at the Property.

43. Through that inspection and Hub City's subsequent reports, MAC learned that the Fire Suppression System contains and uses AFFF/PFAS.

44. Hub City reported that "[t]he foam being utilized is 3% [AFFF/PFAS] - this is a banned foam" and that fluorine-free foam would need to be installed.

45. Hub City further reported that the main foam tank was empty, that the reserve foam tank had contained approximately 220 gallons of 3% AFFF/PFAS and was operating as the main tank, and that the tank would require fluorine-free foam to be safe and legally compliant.

46. MAC sought quotes for remediation, removal, and replacement of the hazardous foam and installation of a non-hazardous, legal, fluorine-free foam system.

47. At least one vendor informed MAC that the cost could exceed $300,000.

48. On May 18, 2026, MAC obtained a $350,000 quote to convert the existing AFFF/PFAS foam system to a fluorine-free foam system.

49. The quote included replacement of existing foam system components, an adequate supply of fluorine-free foam, hydraulic lift, re-sizing main piping and line piping, new sprinkler heads, and other system components. The quote excluded flushing, containment, and removal of existing AFFF foam, meaning MAC's total Losses and damages will likely exceed the $350,000 quote.

III.    THE INOPERABLE VENTILATION SYSTEM.

50.     RAS's paint shop also depends on a ventilation system—which includes a heat-exchange unit and air conditioning—to remove flammable vapors, mists, powders, fumes, and other contaminants from aircraft painting operations (the "Ventilation System").

51.     Before closing, the Ventilation System was inoperable or in need of substantial maintenance.

52.     The condition of the Ventilation System negatively impacted operations at the Property, created health and safety risks for employees, and exposed MAC and RAS to potential regulatory risk in connection with paint operations.

53.     Sellers knew or should have known the Ventilation System's condition before closing.

54.     Sellers were required to disclose that condition under Article III of the Purchase Agreement.

55.     Sellers failed to disclose the condition of the Ventilation System prior to closing and if fact represented and warranted that it was in operable condition, ordinary wear and tear excepted.

56.     MAC has incurred and will continue to incur damages resulting from the undisclosed condition of the Ventilation System and Sellers' breach of the Purchase Agreement.

57.     MAC's damages exceed $100,000 and include the cost to replace the paint-booth ventilation unit and relocate it to the roof, as well as additional costs associated with related HVAC and air-conditioning repairs and replacement.

IV.    **MAC PROVIDED SELLERS WITH NOTICE AND DEMANDED INDEMNIFICATION.**

11

58.    On May 13, 2026, MAC provided Sellers written notice of Direct Claims (the "Direct Claim and Indemnification Demand") and a demand for indemnification under Article VII of the Purchase Agreement.

59.    On May 20, 2026, MAC supplemented its Direct Claim and Indemnification Demand with additional information that had been obtained.

60.    Sellers have refused to indemnify, reimburse, or otherwise make MAC whole for its damages and/or Losses.

61.    MAC has suffered damages and/or will suffer Losses in an amount to be proven at trial.

**COUNT I - BREACH OF CONTRACT**
(All Defendants)

62.    MAC restates and incorporates by reference the allegations set forth above.

63.    The Purchase Agreement is a valid, binding, and enforceable contract between MAC and Sellers.

64.    MAC has performed its obligations under the Purchase Agreement, and all conditions precedent to MAC's right to bring this claim have occurred, have been performed, have been waived, or are excused.

65.    Sellers materially breached Article III of the Purchase Agreement by, among other things: (a) failing to disclose known Hazardous Materials, environmental liabilities, regulatory restrictions, and associated liabilities related to the AFFF/PFAS in the Fire Suppression System; (b) making inaccurate and/or false disclosures, representations, and warranties concerning compliance with laws and permits, and environmental matters; (c) failing to disclose that the Ventilation System was inoperable or in need of substantial maintenance; and (d) falsely

representing and warranting that the Ventilation System was in operable condition, ordinary wear and tear excepted.

66.    Sellers also breached the Purchase Agreement by failing and refusing to indemnify, hold harmless, pay, and reimburse MAC for its Losses after MAC provided notice of Direct Claims and demanded indemnification under Article Seven of the Purchase Agreement.

67.    As a direct and proximate result of Sellers' breaches, MAC has suffered damages and Losses in an amount to be proven at trial, including but not limited to remediation, conversion, replacement, repair, investigation, operational, consequential, incidental, attorneys' fees and expenses to the extent recoverable, and interest-related Losses.

## COUNT II - FRAUD/FRAUDULENT CONCEALMENT
(All Defendants)

68.    MAC restates and incorporates by reference the allegations set forth above.

69.    Before the Purchase Agreement was executed and before closing, Sellers knew material facts concerning the AFFF/PFAS in the Fire Suppression System, including the presence of AFFF/PFAS, Maryland's restrictions or ban on the use, sale, installation, testing, and discharge of that foam, vendors' refusals to service or test the Fire Suppression System, the environmental and health risks associated with AFFF/PFAS, the risk of environmental legal exposure from an accidental discharge, and the need to replace the AFFF/PFAS with a legal, safe, and fluorine-free system.

70.    Sellers had a duty to disclose those facts to MAC.

71.    Sellers had superior and exclusive knowledge of RAS's facilities, equipment, environmental conditions, vendor communications, service records, and legal compliance issues.

72.    Sellers made disclosures, representations, and warranties in the Purchase Agreement concerning those same subjects. Disclosure was necessary to make Sellers'

13

representations, warranties, disclosures, and omissions accurate, truthful, and not intentionally misleading.

73.    Sellers intentionally, knowingly, or recklessly concealed and failed to disclose the AFFF/PFAS hazard and related facts. The pre-closing circumstances of the concealment include, among other things, Pamela's receipt of and participation in communications about state legislation concerning AFFF/PFAS, Pamela's receipt of and participation in communications about restrictions on foam use and discharge, Pamela's receipt and participation in communications regarding the fact that the Fire Suppression System used AFFF/PFAS and was unsafe, Pamela's receipt of and participation in communications acknowledging the fact that AFFF/PFAS contained a toxic forever chemical and possible carcinogens and that discharge could cause environmental legal exposure, and Pamela's receipt of and participation in communications regarding the need to replace the AFFF/PFAS foam with "safe foam."

74.    Upon information and belief, Sellers concealed these facts so that MAC would enter into the Purchase Agreement, close the transaction, and pay the purchase price without requiring a price reduction, escrow, special indemnity, holdback, remediation, or other protection for the AFFF/PFAS hazard.

75.    The concealed facts were material. A reasonable buyer of an aircraft painting, maintenance, repair, and overhaul business would consider it important that a fire suppression system contained banned, hazardous foam, that vendors would not service the system because of environmental and legal risks, and that replacing the system would cost hundreds of thousands of dollars and could disrupt operations.

76.    MAC reasonably and justifiably relied on Sellers' representations, warranties, and disclosures.

14

77.    Had MAC known the truth, MAC would not have entered into the Purchase Agreement.

78.    As a direct and proximate result of Sellers' fraud and fraudulent concealment, MAC has suffered damages in an amount to be proven at trial.

## COUNT III - CONTRACTUAL INDEMNIFICATION
(All Defendants)

79.    MAC restates and incorporates by reference the allegations set forth above.

80.    Section 7.02 of the Purchase Agreement requires Sellers, jointly and severally, to indemnify and hold MAC harmless from and against, and to pay and reimburse MAC for, Losses incurred or sustained by, or imposed upon, MAC based upon, arising out of, with respect to, or by reason of inaccuracies in or breaches of Sellers' disclosures, representations, and warranties and breaches or non-fulfillment of Sellers' covenants, agreements, or obligations under the Purchase Agreement.

81.    MAC's Losses arise out of, with respect to, and by reason of Sellers' inaccuracies, breaches, and non-fulfillment, including Sellers' failure to disclose the AFFF/PFAS hazard and the inoperable Ventilation System, Sellers' breaches of Article III disclosures, representations, and warranties, and Sellers' failure to satisfy their Article VII indemnification obligations.

82.    MAC timely provided Sellers written notice of Direct Claims under Section 7.04(c) of the Purchase Agreement on May 13, 2026 and supplemented that notice on May 20, 2026 with additional written evidence of Losses.

83.    Sellers had the notice and opportunity to respond required by the Purchase Agreement.

84.    Sellers have refused to indemnify, hold harmless, pay, or reimburse MAC for its Losses.

85.   MAC is entitled to judgment requiring Sellers, jointly and severally, to indemnify, hold harmless, pay, and reimburse MAC for all Losses arising from or relating to the matters alleged herein, in an amount to be proven at trial, together with attorneys' fees and expenses to the extent included in Losses or otherwise recoverable, interest, costs, and such other relief as the Court deems just and proper.

**PRAYER FOR RELIEF**

**WHEREFORE**, MAC respectfully requests that the Court enter judgment in its favor and against Defendants as follows:

a.   On Count I, awarding MAC compensatory, consequential, incidental, and other damages in an amount to be proven at trial;

b.   On Count II, awarding MAC compensatory, consequential, incidental, and other damages in an amount to be proven at trial;

c.   On Count III, declaring and adjudging that Sellers are obligated, jointly and severally, to indemnify, hold harmless, pay, and reimburse MAC for all Losses arising out of or relating to the matters alleged in this Complaint, and awarding MAC all such Losses in an amount to be proven at trial;

d.   Awarding MAC pre-judgment and post-judgment interest at the maximum rate permitted by law;

e.   Awarding MAC its costs, expenses, and attorneys' fees to the extent recoverable under the Purchase Agreement or applicable law;

f.   Awarding MAC such other and further relief, at law or in equity, as the Court deems just and proper.

Dated: June 22, 2026

**CROSS & SIMON, LLC**

*/s/ David G. Holmes*
David G. Holmes (No. 4718)
1105 North Market Street, Suite 901
Wilmington, DE 19801
302-777-4200
dholmes@crosslaw.com

- and-

**WINTHROP & WEINSTINE, P.A.**
Matthew R. McBride, Esq.
Quin C. Seiler, Esq.
225 South Sixth Street, Suite 3500
Minneapolis, MN 55402
612-604-6400
mmcbride@winthrop.com
qseiler@winthrop.com

*Attorneys for Plaintiff Mountain Air Cargo, Inc.*

17